```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION

 3  UNITED STATES OF AMERICA,    )    CR. NO. 1:11-239
                                 )    ATLANTA, GA
 4                               )    MAY 3, 2012
                                 )
 5       VERSUS                  )
                                 )
 6  JESUS MANUEL SANDOVAL,       )
                   DEFENDANT.    )
 7  _____)

 8         BEFORE THE HONORABLE E. CLAYTON SCOFIELD, III
               UNITED STATES MAGISTRATE COURT JUDGE
 9                      SUPPRESSION HEARING

10  APPEARANCES:

11  FOR THE GOVERNMENT:          LISA TARVIN, AUSA
                                 U. S. ATTORNEY'S OFFICE - ATL
12                               600 RICHARD RUSSELL BUILDING
                                 75 SPRING STREET, SW
13                               ATLANTA, GA  30303

14  FOR THE DEFENDANT:           THOMAS C. WOOLDRIDGE, ESQ.
                                 WOOLDRIDGE & JEZEK, LLP
15                               1230 PEACHTREE STREET, NE
                                 SUITE 1900
16                               ATLANTA, GA  30309

17  COURT REPORTER:              DEBRA R. BULL, RPR, CRR
                                 UNITED STATES COURT REPORTER
18                               1959 RICHARD RUSSELL BUILDING
                                 75 SPRING STREET, SW
19                               ATLANTA, GA  30303

20

21            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
                     *** *** *** *** ***
22

23

24

25
```

1                         INDEX

2    RONALD DWAYNE GOODEN

3        DIRECT EXAM BY MS. TARVIN                    4

4        CROSS EXAM BY MR. WOOLDRIDGE                 20

5        REDIRECT EXAM BY MS. TARVIN                  30

6        RECROSS EXAM BY MR. WOOLDRIDGE               31

7                     EXHIBITS - GOVERNMENT

8    12 LINE SHEETS OF WIRETAP                        19

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  GOOD MORNING.  PLEASE BE SEATED.  THIS

2 IS THE CASE OF UNITED STATES OF AMERICA VERSUS JESUS SANDOVAL,

3 CASE NUMBER 1:11-CR-239, ASSIGNED TO JUDGE PANNELL AND MYSELF.

4 AND IT IS SET DOWN FOR A HEARING THIS MORNING ON THE MOTION TO

5 SUPPRESS EVIDENCE FILED ON BEHALF OF THE DEFENDANT.  IT IS

6 DOCKET NUMBER 568.  LET'S SEE IF EVERYBODY IS READY TO

7 PROCEED.  IS THE GOVERNMENT READY TO PROCEED?

8    MS. TARVIN:  THE GOVERNMENT IS.

9    THE COURT:  MR. WOOLDRIDGE, IS THE DEFENDANT READY

10 TO PROCEED?

11    MR. WOOLDRIDGE:  WE ARE, YOUR HONOR.

12    THE COURT:  ALL RIGHT THEN.

13    MS. TARVIN:  YOUR HONOR, JUST TO MAKE THINGS A

14 LITTLE SIMPLER, I HAVE PREPARED FOR EVERYBODY A COPY OF THE

15 EXHIBITS, MAY I APPROACH? JUST SO THAT WE DON'T HAVE TO PASS

16 THEM ALONG, EVERYBODY HAS THEIR OWN COPY TO LOOK AT.

17    BEFORE WE BEGIN, YOUR HONOR, I WOULD SORT OF LIKE TO

18 OUTLINE A LITTLE BIT ABOUT WHAT THE GOVERNMENT INTENDS TO

19 PRESENT THIS MORNING.  THE DEFENDANT WAS STOPPED IN A TRACTOR

20 TRAILER BY GEORGIA STATE PATROL ON SEPTEMBER 22ND OF 2009.

21 THERE WAS A VIDEO, THE DEFENDANT GAVE CONSENT, THE TRUCK WAS

22 SEARCHED, AND THERE WERE DRUGS FOUND.  THERE WAS NO WARRANT.

23 PRIOR, THOUGH, TO THE STOP, THE AGENTS, THIS WOULD BE WHAT

24 IS COMMONLY REFERRED TO AS A WALL-OFF STOP.

25    THE COURT:  A WHAT?

1           MS. TARVIN:  A WALL-OFF STOP.

2           THE COURT:   A WALL-OFF?

3           MS. TARVIN:  A WALL-OFF STOP.   SO,  BEFORE

4    PROCEEDING INTO THE ACTUAL STOP,  WE ARE GOING TO PUT UP THE

5    AGENT INVOLVED IN THE INVESTIGATION TO TALK ABOUT FROM A TERM

6    -- FROM A STANDPOINT OF PROBABLE CAUSE TO STOP AND SEARCH.

7    JUST LET THE COURT HAVE A LITTLE BACKGROUND ABOUT HOW WE ARE

8    PROCEEDING.   THE GOVERNMENT'S FIRST WITNESS WILL BE DWAYNE

9    GOODWIN.

10          THE CLERK:  RAISE YOUR RIGHT HAND TO BE SWORN.

11           RONALD DWAYNE GOODEN, HAVING BEEN FIRST DULY SWORN,

12   TESTIFIED AS FOLLOWS:

13          THE CLERK:  PLEASE HAVE A SEAT AND STATE YOUR NAME

14   FOR THE RECORD AND SPELL YOUR LAST.

15          THE WITNESS:  RONALD DWAYNE GOODEN; D-W-A-Y-N-E,

16   G-O-O-D-E-N.

17                          DIRECT EXAM

18   BY MS. TARVIN:

19    Q.    WHERE ARE YOU EMPLOYED?

20    A.    CITY OF ROSWELL POLICE DEPARTMENT.

21    Q.    DO YOU HAVE A SPECIAL ASSIGNMENT OR DETACHMENT?

22    A.    YES, I'M ASSIGNED TO THE DEA AS A TASK FORCE OFFICER.

23   HAVE SO BEEN SINCE AUGUST OF 2003.

24    Q.    HOW LONG HAVE YOU BEEN A POLICE OFFICER?

25    A.    APPROXIMATELY 23 YEARS.

1  Q.   THE ENTIRE TIME AT ROSWELL?

2  A.   YES.

3  Q.   HAVE YOU HAD ON OCCASION DURING YOUR TENURE AS A POLICE

4  OFFICER TO WORK DRUG INVESTIGATIONS?

5  A.   YES, I HAVE.

6  Q.   HAVE YOU HAD AN OCCASION TO BE INVOLVED IN WHAT IS

7  COMMONLY REFERRED TO AS A TITLE III INVESTIGATION?

8  A.   YES, I HAVE.

9  Q.   PRIOR TO COMING TO COURT TODAY, DID YOU REVIEW ANY

10 DOCUMENTS OR ANYTHING IN PREPARATION FOR YOUR TESTIMONY?

11 A.   YES, I HAVE.

12 Q.   WHAT DID YOU REVIEW?

13 A.   I REVIEWED LINE SHEETS FROM THE TITLE III THAT WAS

14 ACTIVE DURING THE DEFENDANT'S ARREST.

15 Q.   AND WHEN YOU SAY LINE SHEETS, THESE ARE THE SUMMARY

16 SHEETS FROM A WIRETAP?

17 A.   YES, THEY ARE.

18 Q.   OKAY.  WHAT ELSE?

19 A.   REPORTS OF THE INVESTIGATION FROM DEA AND GEORGIA

20 STATE PATROL.

21 Q.   AND DID YOU MAKE ANY NOTES IN PREPARATION?

22 A.   YES, I HAVE.

23 Q.   DO YOU HAVE THOSE NOTES WITH YOU?

24 A.   YES, I DO.

25 Q.   HAVE WE PROVIDED A COPY OF THOSE NOTES TO DEFENSE

1  COUNSEL THIS MORNING?

2  A.    YES, WE HAVE.

3  Q.    IF YOU WILL, TELL US HOW OR WHEN THE  -- HOW AND WHEN

4  THE INVESTIGATION BEGAN THAT ULTIMATELY LED TO THE ARREST OF

5  THE DEFENDANT MR. SANDOVAL.

6  A.    IN SEPTEMBER OF  -- I'M SORRY, IN JUNE OF 2008, MYSELF

7  AND SPECIAL AGENT MALLOY INITIATED AN INVESTIGATION INTO A

8  DISTRIBUTION SALE OPERATING IN ATLANTA, GEORGIA, WHOM WE

9  BELIEVED WERE BEING SUPPLIED LARGE AMOUNTS OF COCAINE FROM A

10 SOURCE SUPPLY LOCATED IN MEXICO.  THE DISTRIBUTION CELL THAT

11 WE WERE TARGETING WAS HEADED BY CARLOS MORALES AND WILSON

12 TEJADA.

13    PURSUANT TO THE INVESTIGATION, THERE WAS A CONFIDENTIAL

14 INFORMANT WAS ESTABLISHED AND WE WERE MAKING PURCHASES  OF

15 ILLEGAL DRUGS AND MONITORING DISTRIBUTION EFFORTS BY MORALES

16 AND TEJADA.  IN DOING SO WE IDENTIFIED ADRIAN

17 MARTINEZ-MONTANEZ, A/K/A ALEX, AS A SOURCE OF SUPPLY TO

18 MORALES AND TEJADA.

19 Q.    WHEN YOU TALK ABOUT YOU WERE MONITORING THEM, WHAT

20 TOOLS WERE YOU USING TO MONITOR THE INVESTIGATION INITIALLY

21 OTHER THAN HAVING A CS?

22 A.    THERE WERE TITLE III'S AUTHORIZED FOR PHONES UTILIZED

23 BY MORALES AND TEJADA.

24 Q.    COMMONLY REFERRED TO AS WIRETAPS?

25 A.    YES.

1  Q.    AT ANY POINT IN TIME WERE YOU ABLE TO GET AUTHORIZATION

2  FOR ALEX'S TELEPHONE?

3  A.    YES,  I BELIEVE IT WAS SEPTEMBER 17TH OF 2009, JUDGE

4  PANNELL AUTHORIZED A WIRETAP INTERCEPTION OF PHONE UTILIZED BY

5  ALEX.

6  Q.    WERE YOU ALL MONITORING THAT TELEPHONE AT THE TIME THAT

7  MR. SANDOVAL WAS ARRESTED ON SEPTEMBER 22ND,  2009?

8  A.    YES,  WE WERE.

9  Q.    AROUND THE TIME OF SEPTEMBER 22ND OF 2009,  DID YOU ALL

10 INTERCEPT SOME CONVERSATIONS LEADING UP TO ULTIMATELY THE

11 ARREST OF MR. SANDOVAL?

12 A.    YES,  WE DID.

13 Q.    IF YOU WOULD, IN A SUMMARY FORM, WHAT YOU ALL AS

14 OFFICERS WERE HEARING OVER THE WIRETAP AND HOW THAT LED TO THE

15 IDENTIFICATION OF MR. SANDOVAL.

16 A.    LIKE I PREVIOUSLY STATED, THE INTERCEPTION OF ALEX'S

17 PHONE WAS AUTHORIZED ON SEPTEMBER 17TH,  2009.   SEPTEMBER

18 18TH THROUGH SEPTEMBER 22ND,  WE INTERCEPTED A SERIES OF

19 CONVERSATIONS BETWEEN ALEX AND AN UNKNOWN MALE KNOWN AS UM

20 217.

21 Q.    217?

22 A.    I'M SORRY, 213.

23 Q.    213.  "UM" STANDING FOR?

24 A.    UNKNOWN MALE.

25 Q.    UNKNOWN MALE.  AND THE NUMBER,  WHERE DOES THE NUMBER

1 COME FROM, 213?

2 A.    IT WAS THE SESSION STARTING FROM ZERO, ALL THE CALLS

3 WERE CATALOGED BY SESSION NUMBERS, THAT WAS 213, MEANING IT

4 WAS THE FIRST TIME THEY INTERCEPTED THAT PARTICULAR

5 INDIVIDUAL.

6 Q.    HAS 213 OR UM 213 EVER BEEN IDENTIFIED?

7 A.    TO MY KNOWLEDGE, NO.

8       THE COURT:  DOES HE KEEP THAT SAME NUMBER IF HE

9 APPEARS IN A LATER WIRETAP?

10      THE WITNESS: YES, SIR.  IN OUR PARTICULAR SERIES,

11 IF OUR MONITORS RECOGNIZE HIM, WE ATTEMPT TO KEEP HIS

12 DESIGNATION 213.  IF ANOTHER INVESTIGATION, THEY DON'T KNOW

13 HIM, THEY MAY DESIGNATE HIM SOMETHING ELSE.

14      THE COURT:   OKAY.

15 BY MS. TARVIN:

16 Q.    SO YOU STARTED INTERCEPTING CONVERSATIONS BETWEEN ALEX

17 AND UM 213, WHAT WAS THE SORT OF SUBSTANCE OF THESE

18 CONVERSATIONS?

19 A.    THE FIRST CONVERSATION, AS THE MAJORITY OF THE

20 CONVERSATIONS ARE CODED, THEY ARE NOT IN PLAIN TALK, MEANING

21 THAT THEY ARE NOT AS WE ARE SPEAKING TODAY WITH DIRECT

22 MEANING.  SO IT IS AN INTERPRETATION, BASED ON MY KNOWLEDGE

23 AND EXPERIENCE, THAT LED ME TO BELIEVE PERSONALLY THERE WAS A

24 SHIPMENT OF COCAINE IMMINENT OR GOING TO BE DELIVERED TO

25 ATLANTA, GEORGIA.  AS THOSE CONVERSATIONS PROCEEDED, THEY

1  BECAME A LITTLE BIT MORE OPEN IN THAT IN ONE PARTICULAR

2  CONVERSATION BETWEEN ALEX AND UM 213,  UM 213 SUGGESTING TO

3  ALEX TO PAY THE DRIVER WHO IS UNIDENTIFIED AT THAT TIME ONE

4  THOUSAND DOLLARS PER KILOGRAM OF COCAINE.  HE DOESN'T SAY IT

5  LIKE THAT,  HE MAKES REFERENCE TO BASICALLY ONE FOR ONE AND

6  THERE IS 40.

7  Q.    WHAT DID THAT LEAD YOU TO BELIEVE, BASED UPON YOUR

8  EXPERIENCE?

9  A.    THAT UM 213 HAD OVERSIGHT OF AN UNKNOWN DRIVER WHO WAS

10  TRAVELING TO ATLANTA, GEORGIA, WITH 40 KILOGRAMS OF COCAINE

11  DESTINED TO BE RECEIVED BY ALEX.

12  Q.    WHAT HAPPENED NEXT?

13  A.    THERE SEEMED TO BE SOME PROBLEMS WITH TIMING.  AS THE

14  CONVERSATIONS CONTINUED BETWEEN THE 18TH OF SEPTEMBER AND THE

15  22ND OF SEPTEMBER BETWEEN ALEX AND UM 213, THE DRIVER APPEARED

16  TO BE HAVING MECHANICAL DIFFICULTIES, SO WE WENT FROM THE 18TH

17  TO THE 22ND, AND ONE OF THE LAST CONVERSATIONS BETWEEN ALEX

18  AND UM 213 ON THE 22ND HE WAS INQUIRING AS TO WHY SOMEONE HAD

19  NOT CALLED HIM.  I BELIEVE THAT UM 213 AND THE UNKNOWN --

20  UNIDENTIFIED DRIVER WERE COMMUNICATING WITH ONE ANOTHER AND IT

21  LED ME TO BELIEVE THAT HE HAD BEEN INSTRUCTED TO CALL ALEX AT

22  A CERTAIN POINT SO THEY COULD COMMUNICATE DIRECTLY AND AFFECT

23  THE DELIVERY.

24  Q.    HIM BEING WHOM?  WHO WAS GOING TO CONTACT ALEX

25  DIRECTLY?

1  A.    THE DRIVER.  SO LATER ON SEPTEMBER 22ND, WE GET ANOTHER

2  UNKNOWN MALE WHO WAS DESIGNATED BY 517, AND HE STARTS TALKING

3  TO ALEX ABOUT HIS LOCATION, BASICALLY I'M AN HOUR AND A HALF

4  AWAY, IN THE VICINITY OF BIRMINGHAM.   AND SO HE STARTS OPEN

5  DIALOGUE WITH ALEX ABOUT THE DELIVERY.

6  Q.    AND THIS INDIVIDUAL IS KNOWN TO YOU AT THE TIME AS UM

7  WHAT?

8  A.    517.

9  Q.    517?  AT ANY POINT IN TIME LATER HAVE YOU BEEN ABLE TO

10  IDENTIFY WHO UM 517 WAS?

11  A.    YES, HE WAS LATER IDENTIFIED AS THE DEFENDANT, JESUS

12  MANUEL SANDOVAL.

13  Q.    SO FOR PURPOSES OF THE RECORD,  LET'S REFER TO HIM THEN

14  AS MR. SANDOVAL OR THE DEFENDANT INSTEAD OF USING THE NUMBER,

15  OKAY?

16  A.    YES.

17  Q.    NOW,  AT THE TIME ALL OF THIS IS GOING ON,  IS THERE

18  SOMETHING HAPPENING IN THE ATLANTA AREA DURING THAT TIME THAT

19  WOULD HAVE AFFECTED THE DEFENDANT'S ABILITY TO MAYBE MAKE HIS

20  TRIP OR REACH HIS DESTINATION?

21  A.    YES.  THE ATLANTA AREA WAS EXPERIENCING AN ENORMOUS

22  AMOUNT OF RAIN THAT WAS CAUSING FLOODING IN AND AROUND THE

23  METRO ATLANTA AREA.

24  Q.    TO THE EXTENT THE RAIN WAS CAUSING WHAT KIND OF

25  PROBLEMS?

1  A.    ROADS WERE BEING CLOSED DOWN AND TRAFFIC WAS EXTREMELY

2  DELAYED.

3  Q.    AND ON THE WIRETAP, WERE YOU ALL INTERCEPTING

4  CONVERSATIONS ABOUT THE TROUBLE THE RAIN WAS GIVING THE

5  DRIVER?

6  A.    YES.  MR. SANDOVAL WAS EXPERIENCING  -- HE WAS A VICTIM

7  OF THAT DELAY IN THAT HE WAS STUCK ON  I-20 AND SOMEWHERE EAST

8  OF SIX FLAGS, THE ROAD WAS SHUT DOWN, AND HE ULTIMATELY HAD TO

9  CHOOSE AN ALTERNATE ROUTE TO GET TO NORTHEAST ATLANTA.

10  Q.    DO YOU KNOW WHEN SPECIFICALLY YOU ALL FIRST INTERCEPTED

11  MR. SANDOVAL OR THE DEFENDANT OVER THE WIRETAP?

12  A.    YES,  IT WAS ON SEPTEMBER 22ND.

13  Q.    AND IN THAT FIRST CONVERSATION,  WHAT DID MR. SANDOVAL

14  AND ALEX DISCUSS?

15  A.    TO PARAPHRASE,  MR. SANDOVAL INFORMED ALEX THAT HE WAS

16  ALMOST IN BIRMINGHAM,  TRUCK HAD BROKEN DOWN, AND HE WAS

17  DELAYED BECAUSE OF RAIN AND FOG.

18  Q.    IS THAT THE ONLY CONVERSATION YOU INTERCEPTED BETWEEN

19  ALEX AND THE DEFENDANT?

20  A.    NO.

21  Q.    WHAT WERE THE OTHER CONVERSATIONS?

22  A.    SANDOVAL LATER ADVISED THAT HE WOULD ARRIVE AT ALEX'S

23  LOCATION IN APPROXIMATELY ONE AND A HALF HOURS.   THAT HE WAS

24  NEAR ATLANTA,  WOULD CALL WHEN HE GETS TO INTERSTATE-85.   HE

25  WAS STUCK IN TRAFFIC.   I-20 AT 285 WAS CLOSED,  WILL SEEK

1  ALTERNATE ROUTE.  HE MADE REFERENCE TO AN UNKNOWN SUBJECT

2  WHOM HE CALLED WATKIN WAS BOTHERING HIM ALSO.  DIDN'T KNOW IF

3  WATKIN WAS 213 OR SOMEONE ELSE.  PROCEEDS ON THAT ALEX WOULD

4  RECEIVE HIS LOAD AND WOULD PROVIDE MONEY TO TRANSPORT BACK TO

5  AN UNKNOWN DESTINATION.  THEY WERE DETERMINING WHAT LOCATION

6  TO USE TO UNLOAD DRUGS.  AGAIN, THESE ARE MY NOTES AND I AM

7  PARAPHRASING.

8  Q.    RIGHT.

9  A.    SANDOVAL LATER TOLD ALEX HE WAS MOVING AND ALEX TOLD

10 HIM TO TAKE 285 TO 85 NORTH, CALL HIM WHEN HE WAS IN THE

11 VICINITY OF EXITS 107 AND 108 ON 85 NORTH.  THEN HE INSTRUCTED

12 SANDOVAL TO CALL HIM WHEN HE WAS AT EXIT 101, WHICH IS INDIAN

13 TRAIL.

14 Q.    NOW, LET ME STOP YOU RIGHT HERE.  YOU ALL AS LAW

15 ENFORCEMENT OFFICERS ARE RECEIVING OR HEARING THESE CALLS.

16 ARE YOU ALL JUST LISTENING TO THE CALLS OR ARE YOU TAKING SOME

17 SORT OF ACTION OR MAKING SOME SORT OF PLAN?

18 A.    WE HAVE AN ACTION PLAN.  WE INITIATE SURVEILLANCE AT

19 KNOWN LOCATIONS UTILIZED BY ALEX IDENTIFIED TO THAT POINT.

20 WE AMASS A MAJORITY OF SURVEILLANCE UNITS IN THE AREA OF EXITS

21 107 AND 108.

22 Q.    WHAT ARE EXITS 107 AND 108?

23 A.    I CAN'T REMEMBER WHAT 107 AND 108 ARE, THEY ULTIMATELY

24 GO TO 111, WHICH IS LAWRENCEVILLE/SUWANNEE HIGHWAY.  I

25 BELIEVE 108 AND 107, YOU ARE GETTING IN THE VICINITY OF

1  SUGARLOAF AREA, THAT AREA, THE MALLS.   WE ALSO, ONE OF THE

2  COAGENTS AUTHORS AN AFFIDAVIT FOR GPS PINGING OF SANDOVAL'S

3  PHONE.

4  Q.    HOW DID YOU KNOW SANDOVAL'S TELEPHONE?

5  A.    THE NUMBER WAS TRAPPED WHEN IT CAME INTO THE T2 S2

6  MONITORING SYSTEM.

7  Q.    DOES THAT MEAN YOU ALL WERE ABLE TO TELL BECAUSE OF THE

8  WIRETAP WHO WAS CALLING ALEX?

9  A.    YES.   IT IDENTIFIED THE NUMBER, LAYMAN'S TERM, IT IS

10 CALLER ID.

11 Q.    AND SO YOU ALL GOT A GPS PING, MEANING WHAT WAS THAT

12 GOING TO ALLOW YOU TO DO?

13 A.    IT WAS GOING TO ALLOW US TO LOCATE VIA SATELLITE THE

14 LOCATION OF THE PHONE WITHIN THREE METERS IS THE BEST WE COULD

15 DO.   SOMETIMES IT JUST GIVES US GENERAL LOCATION.   IF YOU

16 GET THREE METERS, IT IS GREAT.

17 Q.    AND IN ORDER TO GET AUTHORIZATION FOR GPS, YOU HAVE TO

18 GET AN ACTUAL SEARCH WARRANT,  CORRECT?

19 A.    YES.

20 Q.    SO AFTER THE MEETING WAS CHANGED OR WAS TOLD TO EXIT AT

21 111,  ALEX INSTRUCTED THE DEFENDANT TO EXIT AT 111,  WHAT

22 HAPPENED NEXT?

23 A.    OF COURSE, WE HAVE THE GPS PINGS ARE ACTIVATED AND THEY

24 MIRROR CONVERSATION OR THEY CORROBORATE CONVERSATION THAT THAT

25 PHONE IS ACTUALLY HERE AND IT IS SYNONYMOUS WITH WHAT IS BEING

1  SAID IN AND THE LOCATIONS ON THE WIRE INTERCEPT.  BUT AFTER

2  MR. SANDOVAL FREES HIMSELF OR BECOMES MOBILE AGAIN FROM

3  TRAFFIC,  AT 10:11 P.M., WE INTERCEPTED A CALL BETWEEN ALEX

4  AND MR. SANDOVAL WHERE HE TOLD MR. SANDOVAL HE WAS AT EXIT

5  111.  ALEX TOLD SANDOVAL TO TURN LEFT AND HE WAS GOING TO BE

6  AT THE SECOND GAS STATION AND WILL GET NEXT TO MR. SANDOVAL

7  AND HIS VEHICLE AND THEN HE WOULD TELL HIM WHAT HE WAS DRIVING

8  SO HE COULD FOLLOW.

9  Q.    WHAT HAPPENED NEXT?

10 A.    10:15 P.M., ALEX AND MR. SANDOVAL WERE TALKING AGAIN.

11 ALEX HAD A VEHICLE, HAD FLASHED HIS LIGHTS WE HAD SEEN AT THE

12 GAS STATION, WHICH WAS A MAROON BURGUNDY COLOR CHEVY  S-10.

13 SANDOVAL LATER ASKED IF THAT WAS HIM THAT FLASHED HIS LIGHTS,

14 ALEX CONFIRMED, SO WE KNEW ALEX WAS IN THAT CHEVROLET S-10.

15 HE PULLED OUT AND GOT IN FRONT OF MR. SANDOVAL. 10:16,

16 CONVERSATION BETWEEN ALEX AND SANDOVAL.  ALEX INSTRUCTED MR.

17 SANDOVAL TO TURN RIGHT, THIS IS AFTER HE EXITED ON TO

18 LAWRENCEVILLE/SUWANNEE HIGHWAY LEFT,  TO TURN RIGHT AT THE

19 NEXT LIGHT, WHICH WAS BUFORD HIGHWAY NORTHBOUND, AND THAT

20 THERE WAS A LOCATION THAT THEY COULD PARK AND ALEX WOULD SEND

21 SOMEONE TO HIM.

22 Q.    SO,  YOU GET A CONVERSATION ABOUT ALEX SAYING OR

23 CONVERSATION ABOUT ALEX HAVING FLASHED LIGHTS.  WAS THERE

24 SURVEILLANCE OF THAT INCIDENT?

25 A.    YES.

1  Q.    AND SURVEILLANCE SAW WHAT?

2  A.    THEY OBSERVED A BURGUNDY MAROON COLORED CHEVY S-10

3  FLASH ITS LIGHTS.

4  Q.    AT THE TIME THAT OCCURRED,  DID YOU ALL KNOW THAT THE

5  BURGUNDY VEHICLE WAS INVOLVED WITH THIS TRANSACTION?

6  A.    I DO NOT RECALL.   I DON'T RECALL SEEING IT DENOTED

7  PRIOR TO THAT.

8  Q.    BUT YOU SAW THE LIGHTS FLASH AND THEN THE PHONE CALL

9  CAME IN ABOUT -- BETWEEN ALEX AND THE DEFENDANT?

10  A.    IT WAS VERY CLOSE TO SIMULTANEOUS.

11  Q.    DID YOU ALL SEE THE BURGUNDY VEHICLE LEAVE THE PARKING

12  LOT AND ENTER ONTO THE ROAD?

13  A.    YES.

14  Q.    AND WHEN IT GOT -- THE BURGUNDY VEHICLE GOT ON THE

15  ROAD,  WHERE DID IT GET IN RELATION TO MR. SANDOVAL?

16  A.    DIRECTLY IN FRONT AS THE LEAD.

17  Q.    DIRECTLY IN FRONT OF HIM?

18  A.    YES.

19  Q.    WHAT WAS MR. SANDOVAL DRIVING?

20  A.    A TRACTOR TRAILER,  THE TRACTOR WAS YELLOW IN COLOR, HE

21  WAS PULLING A WHITE TRAILER.

22  Q.    HOW DID YOU ALL KNOW THAT THAT WAS MR. SANDOVAL'S

23  TRACTOR TRAILER?

24  A.    BASED ON THE GPS PINGING AND HE WAS IDENTIFYING HIS

25  LOCATION OVER THE WIRE INTERCEPT AND SURVEILLANCE OBSERVING

1 ALL OF THAT AT THE SAME TIME.

2 Q.    OKAY.   SO PRIOR TO,  THOUGH,  THIS TIME PERIOD, THERE

3 HAD NOT BEEN ANY CONVERSATIONS ABOUT WHAT MR. SANDOVAL WOULD

4 BE DRIVING OVER THE WIRE?

5 A.    NO.

6 Q.    YOU DIDN'T KNOW WHAT TYPE OF VEHICLE YOU WERE

7 SPECIFICALLY LOOKING FOR?

8 A.    UP TO THAT POINT,  NO.

9 Q.    AFTER THE CONVERSATION WHERE ALEX INSTRUCTED THE

10 DEFENDANT TO TURN RIGHT AND THEN PARK AND THEN ALEX WOULD SEND

11 SOMEBODY TO THE DEFENDANT,  WHAT OCCURRED NEXT?

12 A.    AT 10:20, SANDOVAL INDICATED HE PARKED AND ALEX

13 REITERATED HE WAS GOING TO SEND SOMEONE ELSE.   IT WAS AROUND

14 THAT TIME WE HAD GWINNETT COUNTY SHERIFF'S OFFICER IN THE AREA

15 AND GEORGIA STATE PATROL INTERDICTION UNITS IN THE AREA.

16 THEY WERE PART OF OUR SURVEILLANCE TEAMS.  THEY WERE USED TO

17 INITIATE THE STOP AND CONDUCT THE WALL-OFF.

18 Q.    NOW, WHAT IS A WALL-OFF STOP AND WHAT IS ITS PURPOSE?

19 A.    ITS PURPOSE IS TO CONDUCT AN INTERDICTION OF ANY

20 NARCOTICS OR LARGE AMOUNTS OF PROCEEDS DERIVED FROM NARCOTICS.

21 AND IT IS DESIGNED TO PROTECT THE TOTAL INVESTIGATION FROM

22 IDENTITY AND FOR THE OFFICER INITIATING THE TRAFFIC STOP TO

23 DEVELOP HIS OWN PROBABLE CAUSE AND MAKE THE STOP AND THE

24 CORRESPONDING CONSENTS OR SEARCHES BASED ON HIS OWN EVIDENCE.

25 Q.    AND IN THIS CASE,  WHAT WERE YOU TRYING TO PROTECT BY

1  USING THE WALL-OFF STOP?

2   A.    PROTECT THE ONGOING CONSPIRACY THAT WE WERE

3  INVESTIGATING WITH WIRETAPS AND VARIOUS OTHER MEANS.

4   Q.    AND HAVE YOU, IN YOUR EXPERIENCE, HAD OCCASIONS WHERE

5  INDIVIDUALS SUSPECTED OR BELIEVED THAT THEY WERE BEING

6  INTERCEPTED ON THE WIRETAP AND THEN WOULD DROP THEIR PHONES?

7   A.    NUMEROUS.

8   Q.    AND IS THAT THE TYPE OF SITUATION THAT YOU ALL AS

9  AGENTS WERE TRYING TO PREVENT BY USING THE WALL-OFF STOP?

10   A.    YES.

11   Q.    WHEN YOU USE A WALL-OFF STOP,  DO YOU TELL THE GEORGIA

12  STATE PATROL AND/OR ANYBODY ELSE ASSISTING THAT THERE IS A

13  WIRETAP INVESTIGATION GOING ON?

14   A.    NO.

15   Q.    DID YOU INTERCEPT ANY MORE PHONE CALLS AFTER THE

16  TROOPER STOPPED THE VEHICLE THAT THE DEFENDANT WAS IN?

17   A.    YES.

18   Q.    AND WHAT PHONE CALLS DID YOU ALL INTERCEPT?

19   A.    CONVERSATIONS BETWEEN ALEX AND HIS WORKERS ABOUT THE

20  STOP.   ALEX WANTED TO KNOW IF IT WAS THE LOCAL POLICE OR

21  FEDERAL POLICE MAKING THE STOP,  AT LEAST HIS CONVERSATION

22  INDICATED THAT WAS HIS PURPOSE.   TELLING EVERYONE TO REMAIN

23  CALM,  SIT BACK AND WAIT AND SEE WHAT HAPPENS.   WE, LIKE I

24  SAID, WE IDENTIFIED THE VEHICLE THAT ALEX WAS IN WAS THE

25  BURGUNDY CHEVROLET  S-10.   SOME OF HIS WORKERS WERE IN A

1 GREEN MINIVAN, WHICH I BELIEVE WAS GOING TO BE USED TO OFFLOAD

2 THE 40 KILOS AND TRANSPORT TO AN ALTERNATE LOCATION.

3 ULTIMATELY, WHEN ALEX REALIZED THAT THE SEIZURE WAS TAKING

4 PLACE, HE AND HIS COWORKERS CEASED USE OF THEIR PHONES AND WE

5 LOST THOSE INTERCEPTS.

6 Q.    DID YOU GO OUT ON THE SCENE WHILE THE SEARCH WAS BEING

7 CONDUCTED OR WHILE GEORGIA STATE PATROL WAS SPEAKING WITH THE

8 DEFENDANT?

9 A.    MY ARRIVAL WAS AFTER THE SEARCH WAS  -- MY ARRIVAL WAS

10 AFTER THE 40 KILOGRAMS WERE LOCATED.   THERE WAS STILL SOME

11 RESIDUAL SEARCH GOING FORTH THAT POINT FOR DOCUMENTS AND

12 ADMINISTRATIVE STUFF.

13 Q.    WERE DOCUMENTS SEIZED AS PART OF THIS INVESTIGATION?

14 A.    YES.

15 Q.    AS PART OF THIS STOP?

16 A.    YES.

17 Q.    HAD YOU NOT BEEN CONCERNED ABOUT THE WIRE,  WOULD YOU

18 HAVE SEARCHED THAT VEHICLE BASED UPON PROBABLE CAUSE,  YOUR

19 BELIEF?

20 A.    ABSOLUTELY.

21 Q.    AND IN A NUTSHELL,  COULD YOU TELL US WHAT YOU BELIEVED

22 YOU HAD IN TERMS OF PROBABLE CAUSE TO STOP AND SEARCH THE

23 VEHICLE ON SEPTEMBER 22ND OF 2009, THAT BEING MR. SANDOVAL'S

24 TRACTOR TRAILER?

25 A.    BASED ON THE TOTALITY OF THE CONVERSATIONS OVER THE

1  WIRE AND MY EXPERIENCE, I STRONGLY BELIEVED THERE WERE 40

2  KILOGRAMS OF COCAINE CONCEALED IN THAT TRACTOR TRAILER.

3  Q.   I WANT TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S

4  EXHIBIT NUMBER 12.   CAN YOU IDENTIFY THAT FOR THE RECORD?

5  A.   THIS IS A SYNOPSIS OF THE WIRE INTERCEPT SESSION 213

6  OFF OF ALEX'S PHONE.

7  Q.   THE WHOLE PACKAGE, THOUGH, IS WHAT, NOT JUST THE TOP

8  PAGE.

9  A.   COMPILATION OF DIFFERENT SYNOPSIS FROM THAT WIRE

10  INTERCEPT.

11  Q.   THOSE ARE THE LINE SHEETS?

12  A.   YES.

13  Q.   ARE THOSE THE LINE SHEETS THAT YOU HAVE REFERRED TO

14  TODAY IN YOUR TESTIMONY?

15  A.   YES, THEY ARE.

16  Q.   AND ARE THOSE THE LINE SHEETS THAT YOU HAVE SUMMARIZED

17  IN YOUR TESTIMONY LEADING YOU TO BELIEVE THERE WAS PROBABLE

18  CAUSE?

19  A.   YES.

20       MS. TARVIN:  YOUR HONOR, AT THIS TIME I WOULD TENDER

21  GOVERNMENT'S EXHIBIT NUMBER 12.

22       THE COURT:   ANY OBJECTION?

23       MR. WOOLDRIDGE:  NO OBJECTION.

24       THE COURT:  IT IS ADMITTED.

25

1  BY MS. TARVIN:

2  Q.    DID THESE EVENTS OCCUR IN THE NORTHERN DISTRICT OF

3  GEORGIA?

4  A.    YES, THEY DID.

5         THE COURT:    IT IS ADMITTED FOR PURPOSES OF THIS

6  HEARING.    CROSS EXAM.

7         MR. WOOLDRIDGE:  A FEW QUESTIONS.

8                          CROSS EXAM

9  BY MR. WOOLDRIDGE:

10  Q.    YOUR TESTIMONY A MOMENT AGO WAS THAT THE FIRST TIME MR.

11  SANDOVAL SHOWED UP ON THE TITLE III WAS SEPTEMBER 22ND?

12  A.    YES.

13  Q.    WERE THERE ANY CONVERSATIONS BETWEEN, TO YOUR

14  KNOWLEDGE, BETWEEN UM 213 AND MR. SANDOVAL?

15  A.    I BELIEVE WE WENT BACK AFTER THE FACT AND TRIED TO

16  IDENTIFY UM 213, THAT THERE IS POSSIBLY A RECORD THAT THERE

17  IS DATA INDICATING CONVERSATIONS OR CONVERSATIONS BETWEEN MR.

18  SANDOVAL'S PHONE AND MR. -- AND UM 213'S PHONE.

19  Q.    WHAT KIND OF DATA?

20  A.    CALL DETAIL RECORDS.

21  Q.    IF YOU DIDN'T HAVE A WIRETAP ON MR. SANDOVAL'S PHONE

22  AND YOU DIDN'T HAVE ONE ON UM 213, HOW COULD YOU HAVE DATA ON

23  THAT?

24  A.    WE WOULD HAVE TO SUBPOENA OR GET A SEARCH WARRANT TO GO

25  BACK AND GET HISTORICAL DATA.

1  Q.    AFTER YOU SIZED THE TELEPHONE ON SEPTEMBER 22ND,  YOU

2  CAN PULL DATA OFF THAT TO SHOW CONVERSATION?

3  A.    YOU CAN DO IT, PROVIDE SUBPOENA TO THE PROVIDER.

4        THE COURT:   TO WHO?

5        THE WITNESS:  THE PROVIDER.

6  BY MR. WOOLDRIDGE:

7  Q.    A MOMENT AGO YOU SAID UM 213 STILL HAS NOT BEEN

8  IDENTIFIED,  RIGHT?

9  A.    CORRECT.

10  Q.    SO HOW WOULD YOU KNOW ANY OF THE DATA YOU PULLED FROM

11  THE PROVIDER FOR THE PHONE HAD ANY LINK TO THE UNKNOWN

12  IDENTITY OF 213?

13  A.    SPECIFICALLY TO THE INDIVIDUAL I COULD NOT.   BUT I CAN

14  SAY THE PHONE THAT MR. 213 WAS USING AND THE PHONE MR.

15  SANDOVAL WAS USING, I COULD SHOW A CONNECTION BETWEEN THE TWO

16  DEVICES.

17  Q.    I UNDERSTAND HOW YOU CAN KNOW MR. SANDOVAL'S PHONE

18  NUMBER NOW BECAUSE YOU SEIZED IT AND BECAUSE YOU HAVE A RECORD

19  OF IT.   HOW WOULD YOU KNOW THE PHONE NUMBER OF 213?

20  A.    IT WAS ALSO BEING INTERCEPTED.

21  Q.    CALLER ID FROM THE WIRETAPS?

22  A.    YES.

23  Q.    YOU TAKE CALLER ID INFORMATION FROM THE WIRETAPS OF

24  ALEX, COMPARE IT TO THE PHONE OF MR. SANDOVAL THAT WERE SEIZED

25  AND LOOK AT THAT RECORD?

1  A.    NO,  I WOULD JUST SIMPLY ORDER SUBSCRIBER AND CALL

2  DETAIL RECORD FOR BOTH PHONES.

3  Q.    AND SO YOU HAVE DEFINITELY DONE THAT AT THIS POINT?

4  A.    I CAN'T SAY DEFINITELY,  I BELIEVE IT WAS DONE AND I

5  WILL CHECK.

6  Q.    HAS ALEX BEEN ARRESTED YET?

7  A.    YES.

8  Q.    NOW,  YOU DID GET A SEARCH WARRANT FOR THE GPS PING

9  DATA ON THE 22ND,  RIGHT?

10  A.    YES.

11  Q.    WHAT TIME DID YOU GET THAT SEARCH WARRANT?

12  A.    I DON'T RECALL.

13  Q.    IT WAS OBVIOUSLY AFTER THE FIRST PHONE CALL FROM MR.

14  SANDOVAL CAME IN ON THE 22ND,  RIGHT?

15  A.    YES.

16  Q.    CAN YOU LOOK AT YOUR LOGS THERE?  DO YOU HAVE ANY IDEA

17  ABOUT WHAT TIME THAT PHONE CALL CAME IN?

18  A.    THE FIRST PHONE CALL?

19  Q.    WHICH EVER PHONE CALL CAUSED TO YOU DECIDE IT WAS IN

20  THE GOVERNMENT'S BEST INTEREST TO GET A SEARCH WARRANT FOR THE

21  PING.

22  A.    IT WOULD BE SESSION 517 ON THE 22ND, WHICH IS GOING TO

23  BE APPROXIMATELY 10:57 A.M. ON THE 22ND.

24  Q.    WHAT DID YOU DO THAT DAY IN ORDER TO GET THAT SEARCH

25  WARRANT?

1   A.   I PERSONALLY PROVIDED INFORMATION, FACTUAL INFORMATION

2   TO ANOTHER TASK FORCE OFFICER WHO AUTHORED THE AFFIDAVIT.

3   Q.   AND THEN THAT AFFIDAVIT WAS GIVEN TO A FEDERAL JUDGE?

4   A.   YES.

5   Q.   AND THEN WHAT TIME DID YOU GET THAT SEARCH WARRANT

6   BACK,  DO YOU REMEMBER?

7   A.   I DON'T RECALL.   I CAN TELL YOU WHAT TIME THE FIRST

8   PING WAS EXECUTED AND IT WOULD BE VERY CLOSE TO THAT TIME.

9   Q.   SO, OKAY, WHAT TIME WAS THAT?

10  A.   MS. TARVIN HAS THAT DATA OVER THERE.

11       MR. WOOLDRIDGE:  I AM GOING TO APPROACH THE WITNESS.

12       THE COURT:   YOU MAY.

13  BY MR. WOOLDRIDGE:

14  Q.   OFFICER GOODWIN, FOR THE RECORD, I HAVE JUST HANDED YOU

15  A DOCUMENT HANDED TO ME BY THE ASSISTANT U. S. ATTORNEY LISA

16  TARVIN, CAN YOU IDENTIFY THIS DOCUMENT?

17  A.   YES.  I PRINTED THIS DOCUMENT THIS MORNING.   IT IS A

18  RECORD I HAD OF THE GPS PINGING THAT WAS INCLUDED WITH THE

19  RETURN FOR THE WARRANT AUTHORIZING THE PINGING OF MR.

20  SANDOVAL'S PHONE.

21       MR. WOOLDRIDGE:  MIGHT I APPROACH AGAIN,  YOUR HONOR?

22       THE COURT:   YOU MAY.

23  BY MR. WOOLDRIDGE:

24  Q.   FOR THE RECORD, THIS DOCUMENT IS EXHIBIT NUMBER 13.  I

25  WILL PUT THE WORD GOVERNMENT EXHIBIT IF THEY LIKE TO ADMIT IT

1 PROPERLY THEY CAN.   I AM SORRY,  CAN YOU TELL ME ONE MORE

2 TIME WHAT THIS DOCUMENT IS?

3  A.    IT IS A REFLECTION OF THE GPS PINGING CONDUCTED OVER

4 MR. SANDOVAL'S PHONE.

5  Q.    THERE WERE NUMEROUS GPS PINGING THAT WAS CONDUCTED THAT

6 DAY?

7  A.    YES.

8  Q.    IT LOOKS LIKE THE FIRST ONE WAS 4:45 -- 16:48, WHICH IS

9 4:48 P.M.?

10  A.    NO.   IF YOU LOOK AT THAT,  THE HEADER OF THAT COLUMN,

11 IT IS GOING TO BE CENTRAL STANDARD TIME, SO WE NEED TO ADD AN

12 HOUR FOR EASTERN.

13  Q.    SO,  5:48 P.M.?

14  A.    YES.

15  Q.    AND THE DOCUMENT SHOWS A COUPLE DOZEN PINGS,  PAGE AND

16 A HALF DOCUMENT.   WHY DID THEY SAY "FAILURE" AND "SUCCESS,"

17 WHAT DOES THAT MEAN?

18  A.    "FAILURE" MEANS NO DATA WAS OBTAINED, WE WERE NOT ABLE

19 TO SUCCESSFULLY LOCATE THAT PHONE.

20  Q.    AND SO THIS WAS YOUR WAY OF TRACKING WHERE MR. SANDOVAL

21 WAS THAT DAY?

22  A.    YES.

23  Q.    AND SINCE THE FIRST RECORD, THE FIRST PING IS 5:48 AND

24 THE SEARCH WARRANT WAS APPLIED FOR AT 10:57, IT LOOKS LIKE

25 ABOUT SIX HOURS BETWEEN THE TIME THAT YOU APPLIED FOR THE

1 WARRANT AND THE TIME THE PINGING STARTED?

2  A.    YES.

3  Q.    WHY DIDN'T YOU GET -- SEEK A SEARCH WARRANT FOR THE

4 VEHICLE IN THAT TIME?

5  A.    DURING THE STOP?

6  Q.    WELL, AT THE POINT THAT YOU KNEW A DRUG TRANSACTION

7 WAS GOING TO HAPPEN THAT NIGHT, WHY DIDN'T YOU TRY TO GET A

8 SEARCH WARRANT SO YOU COULD HAVE A WARRANT TO SEARCH THE

9 VEHICLE?

10  A.    BECAUSE WE WERE TRYING TO PRESERVE THE INVESTIGATION

11 AND TRYING TO ACHIEVE OUR GOAL THROUGH CONSENT IN A WALL-OFF.

12  Q.    HOW WOULD GETTING A SEARCH WARRANT HAVE HURT YOUR

13 INVESTIGATION?

14  A.    JUST THE DISCOVERY, HAVING TO TURN THAT INFORMATION

15 OVER AT THAT TIME.

16  Q.    IS IT FAIR TO SAY THAT YOU COULD HAVE GOTTEN A SEARCH

17 WARRANT, YOU HAD TIME TO DO IT?

18  A.    YES.  I COULD HAVE GOTTEN A SEARCH WARRANT, I WOULD

19 HAVE TO CUT MR. SANDOVAL LOOSE.

20  Q.    I AM NOT TALKING ABOUT AFTER THE VEHICLE WAS PULLED, I

21 AM TALKING ABOUT AFTER YOU FOUND OUT THROUGH THE WIRETAPS THAT

22 A DELIVERY OF COCAINE MAY HAVE BEEN COMING INTO THE ATLANTA

23 AREA, THEN THAT PROMPTED YOU TO GET GPS SEARCH WARRANT SO YOU

24 COULD PING, YOU GET PINGS FROM THE PHONE.  YOU ALSO COULD

25 HAVE GOTTEN A SEARCH WARRANT TO ACTUALLY SEARCH THE VEHICLE

1  ONCE IT GOT TO ATLANTA, RIGHT?

2  A.    I DIDN'T KNOW WHAT THE VEHICLE WAS UNTIL WE SAW IT MAKE

3  A LEFT TURN OFF THE EXIT OF LAWRENCEVILLE/SUWANNEE.

4  Q.    YOU DIDN'T KNOW WHAT THE VEHICLE WAS GOING TO BE, BUT

5  YOU COULD HAVE SEARCHED UNKNOWN MALE 517 ONCE THE VEHICLE GOT

6  HERE?

7  A.    NOT A COMMON PRACTICE FOR ME TO APPLY FOR A WARRANT OR

8  AT LEAST SECURE AN AFFIDAVIT FOR AN APPLICATION WITHOUT HAVING

9  AN IDENTIFICATION OF THE PROPERTY I AM GOING TO SEARCH.

10  Q.    SO IS IT THEN YOUR BELIEF YOU COULDN'T GET THE SEARCH

11  WARRANT BECAUSE YOU DIDN'T KNOW THE TRUCK, IS THAT ESSENTIALLY

12  YOUR LEGAL POSITION ON IT?

13  A.    NO, MY LEGAL POSITION IS I KNEW PROBABLE CAUSE WAS

14  DEVELOPING OR HAD ALREADY DEVELOPED UP TO THAT POINT.  THAT

15  IF I HAD A LEGAL DESCRIPTION OF PROPERTY SEIZED, YES, I COULD

16  HAVE GOT A WARRANT AT THAT TIME.

17  Q.    YEAH, SURE.

18  A.    I WOULD HAVE APPLIED FOR ONE.

19  Q.    PROBABLE CAUSE IS JUST ONE PART OF THE TEST, THOUGH,

20  YOU HAVE TO HAVE PROBABLE CAUSE, YOU HAVE TO HAVE OTHER

21  EXIGENT CIRCUMSTANCES, RIGHT? YOU UNDERSTAND THE RULE ON

22  WHEN YOU CAN DO A SEARCH WITHOUT A WARRANT?

23  A.    YES, I DO.

24  Q.    SO YOU HAVE TO HAVE PROBABLE CAUSE AND THEN YOU ALSO

25  HAVE TO BE IN SOME KIND OF A SITUATION THAT LETS YOU DO A

1  SEARCH WITH THAT WARRANT?

2  A.    YES.

3  Q.    MY QUESTION TO YOU IS, IF YOU HAD ALL AFTERNOON,  WHY

4  DIDN'T YOU GET THE WARRANT?

5  A.    TO RESTATE, I DIDN'T HAVE,  I MEAN,  ARE YOU INDICATING

6  AN ANTICIPATORY WARRANT?

7  Q.    I AM JUST ASKING WHAT YOUR OPINION IS.

8  A.    I DIDN'T HAVE AN ITEM TO SEARCH.

9        THE COURT:   IS THIS BEFORE OR AFTER THE SEARCH?  I

10 AM TRYING TO CLARIFY.

11        MR. WOOLDRIDGE:  MY QUESTION IS BEFORE.

12        THE COURT:   I THOUGHT HE SORT OF EXPLAINED THAT.

13        MR. WOOLDRIDGE:  I THINK HE HAS.  WE ARE JUST

14 WRAPPING IT UP.

15 BY MR. WOOLDRIDGE:

16 Q.    JUST TO WRAP THIS UP, PUT A LITTLE BOW ON IT,  THE

17 REASON YOU DIDN'T GET A SEARCH WARRANT FOR THE VEHICLE WAS

18 BECAUSE YOU WEREN'T SURE WHAT THE VEHICLE WAS GOING TO BE?

19 A.    I DIDN'T ENTERTAIN GETTING A SEARCH WARRANT PERIOD AT

20 THAT TIME.

21 Q.    ANTICIPATORY WAS ANTICIPATORY.  YOUR INTENT WAS TO

22 WALL-OFF THE STOP ANYWAY?

23 A.    YES.

24 Q.    WHEN YOU WALL-OFF THE STOP, YOU DON'T HAVE TO DISCLOSE

25 INFORMATION ABOUT THE CASE TO THE PERSON AT THE SCENE?

1  A.    NO.

2  Q.    "NO," MEANING, NO, YOU DON'T HAVE TO OR, NO, I AM WRONG

3  IN THE WAY I FORM THE QUESTION?

4  A.    NO,  THE ANSWER TO THE QUESTION I DON'T HAVE TO

5  DISCLOSE IT TO THE PERSON AT THE SCENE.

6  Q.    PART OF THE REASON YOU DO THAT AT A SCENE IS TO PROTECT

7  THE INVESTIGATION?

8  A.    YES.

9  Q.    OFTENTIMES WHEN YOU DO THAT, THE POLICE OFFICER, THEY

10 HAVE PROBABLE CAUSE FOR THE PULL BECAUSE OF A TRAFFIC

11 VIOLATION,  RIGHT?

12 A.    YES.

13 Q.    AND THEN THEY EITHER ATTEMPT TO OBTAIN CONSENT FOR A

14 SEARCH, THAT IS SORT OF THE NEXT STEP IN A WALLED-OFF STOP,

15 THEY GET CONSENT?

16 A.    YES.

17 Q.    IF THEY FAIL TO GET CONSENT, THEY MAKE SOME ATTEMPT TO

18 ESTABLISH THEIR OWN PROBABLE CAUSE AT THE SCENE?

19 A.    YES.

20 Q.    USUALLY THAT IS DONE,  IT CAN BE BY DOING A K-9 OPEN

21 AIR SNIFF TO ESTABLISH PROBABLE CAUSE?

22 A.    YES.

23 Q.    IT CAN BE DONE IN MANY OTHER WAYS THAT AN OFFICER MIGHT

24 LOOK AT A PERSON AND DETERMINE WHETHER OR NOT THERE MIGHT BE

25 DRUGS IN THE VEHICLE SOMEHOW,  LOTS OF DIFFERENT WAYS TO DO

1 THAT?

2 A.    YES.

3 Q.    AND WHEN THEY DO THAT, YOU TYPICALLY DON'T HAVE TO

4 TESTIFY AT SUPPRESSION HEARINGS, DO YOU?

5 A.    NO.

6 Q.    THAT IS A LITTLE UNUSUAL FOR YOU TO DO A WALLED-OFF

7 STOP AND COME IN AND TESTIFY AT A SUPPRESSION HEARING TODAY,

8 RIGHT?

9 A.    WE HAVE CLOSED, THE CASE IS TAKEN DOWN, DISCOVERY IS

10 OUT.

11 Q.    AND UM 213 HASN'T BEEN IDENTIFIED, HAS HE?

12 A.    NO.

13 Q.    STILL PEOPLE OUT THERE INVOLVED IN THIS THAT ARE

14 RUNNING AROUND FREE, PROBABLY?

15 A.    YES.

16 Q.    SO IT IS A LITTLE UNUSUAL THAT YOU WOULD DISCLOSE

17 WIRETAPS AND THINGS LIKE THAT AT A SUPPRESSION HEARING DURING

18 A WALLED-OFF TRAFFIC STOP?

19 A.    AT THIS POINT, NO.

20 Q.    AT THIS POINT, NO.  IT IS YOUR OPINION BECAUSE

21 EVERYTHING IS ALREADY OUT THERE YOU DON'T HAVE ANYTHING TO

22 PROTECT ANYMORE?

23 A.    MY OPINION, YES.  AND MY EXPERIENCES WITH OTHERS.

24 Q.    ALL RIGHT.  UNDERSTAND.  AND SO JUST TO FINISH THIS

25 UP, THE CONVERSATIONS BETWEEN ALEX AND BETWEEN MR. SANDOVAL,

1  YOU ONLY HAVE THAT ONE SINGLE DAY,  NO OTHER CONVERSATIONS,

2  ANY WIRETAPS THAT LINK THE TWO PARTIES TOGETHER?

3  A.    IN OUR WIRETAP,  NO.

4          MR. WOOLDRIDGE:  THANK YOU.  I HAVE NO FURTHER

5  QUESTIONS.

6          THE COURT:  ANY REDIRECT?

7                      REDIRECT EXAM

8  BY MS. TARVIN:

9  Q.    WAS THE DEFENDANT ARRESTED?

10  A.    YES.

11  Q.    ON STATE OR FEDERAL CHARGES?

12  A.    ORIGINALLY ON STATE.

13  Q.    AND THE STATE, THAT IS A PART OF THE WALL-OFF

14  PROCEDURE?

15  A.    YES.

16  Q.    THAT SOMEBODY WHO IS ARRESTED IS PUT INTO STATE

17  CUSTODY?

18  A.    YES.

19  Q.    AND THEN ARE THERE EVER MOTIONS TO SUPPRESS IN THE

20  STATE?

21  A.    YES.

22  Q.    AND HOW ARE THOSE HANDLED?

23  A.    BY THE ARRESTING OFFICER.

24  Q.    AND THE ARRESTING OFFICER BEING EITHER A TROOPER OR A

25  DEPUTY OR SOME LOCAL LAW ENFORCEMENT,  CORRECT?

1  A.    YES.

2  Q.    AND THEY HAVE NOT BEEN TOLD ABOUT THE WIRETAPS,

3  CORRECT?

4  A.    TO MY KNOWLEDGE,  NO.

5                        RECROSS EXAM

6  BY MR. WOOLDRIDGE:

7  Q.    AND THE STATE CHARGES AGAINST MR. SANDOVAL WERE

8  ULTIMATELY DISMISSED,  WERE THEY NOT?

9  A.    YES.

10          MR. WOOLDRIDGE:  THAT IS ALL.

11          THE COURT:   ALL RIGHT.   YOU MAY STEP DOWN.   THANK

12  YOU.

13          MR. WOOLDRIDGE:  YOUR HONOR,  I THINK A BRIEF RECESS

14  TO DISCUSS THIS WITH MY CLIENT, WE MAY BE ABLE TO WRAP UP THIS

15  HEARING WITH NO FURTHER WITNESSES.

16          THE COURT:   ALL RIGHT.   I THINK I CAN UNDERSTAND

17  THAT.   WE WILL TAKE A BRIEF RECESS AND GIVE YOU AN

18  OPPORTUNITY TO TALK TO YOUR CLIENT.

19  (WHEREUPON, A SHORT RECESS WAS HELD.)

20          THE COURT:   WHERE ARE WE NOW?  GOVERNMENT GOING TO

21  CALL THE NEXT WITNESS OR WHAT?

22          MR. WOOLDRIDGE:  AT THIS TIME I THINK IT WOULD BE A

23  GOOD IDEA TO CONCLUDE THIS HEARING BASED ON THE INFORMATION WE

24  LEARNED, THIS TESTIMONY -- BASED ON THE OFFICER'S TESTIMONY

25  THIS MORNING, WE WILL WITHDRAW OUR MOTION.   WANT A COPY OF

1  THE TRANSCRIPT.

2         THE COURT:   YOU WILL WITHDRAW THE MOTION.   YOU ARE

3  SATISFIED THAT THAT IS NOT A BASIS FOR SUPPRESSION OF THE

4  EVIDENCE BASED ON WHAT YOU HAVE HEARD SO FAR?

5         MR. WOOLDRIDGE:  YES.

6         THE COURT:   ALL RIGHT.  THAT IS FINE.   THEN IT

7  WON'T BE NECESSARY FOR THE GOVERNMENT TO PUT UP ANYMORE

8  EVIDENCE?  I ASSUME YOU HAD THE STATE PATROL.

9         MS. TARVIN:  HAD STATE TROOPER AND VIDEO READY TO GO.

10        THE COURT:   HAD VIDEO READY TO GO.   YOU HAVE SEEN

11  ENOUGH?

12        MR. WOOLDRIDGE:  WE HAVE SEEN ENOUGH.

13        THE COURT:   ALL RIGHT.   THEN THE MOTION IS

14  WITHDRAWN AT THIS POINT.   YOU CAN OBTAIN A TRANSCRIPT THROUGH

15  THE USUAL PROCESS IF YOU WANT TO GET ONE.   ALL RIGHT.   THEN

16  THAT CUTS IT SHORT AT LEAST FROM THAT STANDPOINT.   ANY OTHER

17  MOTIONS PENDING?

18        MR. WOOLDRIDGE:  I DON'T BELIEVE SO,  YOUR HONOR.

19        THE COURT:   AT LEAST AS TO THE DEFENDANT.  I KNOW A

20  NUMBER OF OTHER DEFENDANTS IN THE CASE, BUT AS TO THIS

21  DEFENDANT WE CAN CERTIFY THE CASE READY.   IT WON'T GO TO

22  TRIAL UNTIL ALL OF THE DEFENDANTS ARE SATISFIED.   SO IT IS

23  NOT LIKE YOU WILL BE PUT ON THE TRIAL CALENDAR NEXT WEEK.   IT

24  WILL BE AS SOON AS THAT HAPPENS.   AS SOON AS ALL DEFENDANTS

25  ARE FULLY HEARD AND CERTIFIED.   ALL RIGHT.   ANYTHING ELSE

1   THAT WE CAN TAKE UP?

2        MS. TARVIN:  NO.

3        MR. WOOLDRIDGE:  NO.

4        THE COURT:   WE WILL BE IN RECESS.

5           *** END OF REQUESTED TRANSCRIPT ***

6   * * * * * * * * * * * * * * * * * * * * * * * * *

7                 CERTIFICATE OF REPORTER

8     I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

9   MY STENOGRAPHIC NOTES IN THE ABOVE-ENTITLED MATTER.

10

11

12

13

14   S/DEBRA R. BULL, RPR, CRR          JUNE 2, 2012
                                        DATE

15

16

17

18

19

20

21

22

23

24

25